Court, Mr. Underhill, the purpose of the discretionary function exception is to ensure that we don't have judicial second-guessing of a government official who is acting to impart legislative, administrative, and executive decisions which are grounded in public policy. Counsel, help me with the detail of the case. Sure. I'm trying to figure out exactly what negligence is alleged. Is the negligence keeping the boilers, both of the boilers, running? Or is the negligence alleged something else, like not blowing the stacks before getting into port or not testing the fuel from some sheikdom? I can't remember if it was Abu Dhabi or another. No, it was Fujairah. They did test that fuel. They didn't test the fuel in Busan, Korea. I'm not asking you about... Sure. The details of the testing. I'm asking you what negligence is alleged. There's two parts, two negligence acts. The first was operating both boilers in port, and the second was failing to test fuel oil as required. Operating both boilers... In port. In port. And the other was not... Failing to test, to pretest fuel that was taken on board the vessel. Now, what evidence was there on the causation between the failing to test and the damage to the Mazdas? Yes. There was the expert who tested, our marine expert, marine fuel expert, testified that there were high contents of vanadium in the fuel oil that was saved, that was received from Fujairah. How does that show that testing makes any difference? I thought the evidence was that you find vanadium in the sort of fuel that these sort of ships use. Not at the high content that they were in the Fujairah fuel. That Fujairah fuel was tested afterwards. The Busan fuel was never tested because it was destroyed after the incident. So it tends to show that the fuel came then from Fujairah, and the fact that the fuel came from Fujairah tends to show that this ship caused the damage to the cars, but it still doesn't tend to show, as far as I can tell, that had they tested properly, they would not have still blasted out enough soot to damage the cars. Well, we don't know that yet, Your Honor, because there was no testimony in district court, because the court found that there was... Summary judgment, right? Yes. It wasn't some – well, they held that the discretionary function exception applied and therefore they didn't do a fact-finding analysis, a detailed fact-finding analysis. But facts were used – facts were taken into account as far as... Yes. Yes, Your Honor. Yes. And what we focused on... But evidence is there. You've got evidence that this ship did it and it was fuel from Fujairah, and that the fuel wasn't tested properly. But had the fuel been tested properly, is there any evidence that the casualty would not have occurred? No. There's no evidence of that, Your Honor, because... That would seem to limit you to number one, operating both boilers and port, because if you don't have evidence, you've got to have – let's say it's negligent not to test the fuel from Fujairah properly. Yes. It still has to cause the soot to be on the – the act of negligence is the not testing, and you have to show that the not testing causes the fuel to deposit soot on the car. Sure. But what the – what the marine fuels expert and what the marine engineering expert testified to is that when you have poor fuel, you have incomplete combustion. What the soot is is incomplete combustion, which is emitted from the ship's stack. If they had tested the fuel immediately upon putting it into Fujairah and they said it's got too much vanadium, what were the alternatives that were available to get the ship to where it was going? They would have to receive new fuel, and they would have to tell the supplier. From where? Fujairah. There are – there are treatments that you can treat the fuel with. So it's not only the failure to test, but the failure to test, and if tested bad, the replacement with another type of fuel. Correct, Your Honor. All right. Was there evidence they would have done that? Pardon? Was there evidence that they would have done something about it had they tested? There was no evidence because it was never pretested. So there was no – no. The answer to that is no. All right. There could have been testimony to deposition. Gee, if we had tested it and found all this vanadium, we would have said they have to pump it out and replace it, or we would have done this or that, and that would have prevented the soot. And that's what I'm asking about. There was no evidence to that – to that extent, Your Honor, that they would have tested – that they would have offloaded it and put on new fuel or treated it with some other chemical to lower the vanadium. So following up on Judge Kleinfeld's statement, you're stuck with the first ground. You win or lose on keeping the boilers running. That is the main focus, yes, but there is still the fact that the Court cannot grant summary judgment on the failure to test the fuel because that failure to test the fuel was not governed by the discretionary function exception, and that should have gone to trial. Counsel, it doesn't have to. Failure to test the fuel was not shown to have mattered. That's why I ask you those questions. If they did something wrong, but there's no evidence that had they done it right, it would have prevented the deposition of soot, then I don't – Here's the problem. The fuel that was being burned at the time while they were in port was from two different load ports, Busan, Korea, and Fujairah. The Busan fuel was available after the incident. It was destroyed by the government. It was not saved. So that was never tested by our experts to determine whether it was bad fuel. A jury can determine or a fact finder can clearly determine that since the Fujairah fuel we know was not pretested and had high contents of vanadium, a jury could have inferred that the improper combustion – I'm not getting across. My thinking is that the only evidence that why soot was deposited on the Mazdas in this case is that both boilers were kept running in port. And when you keep the boilers running, I can't remember the article, but basically while the car is idling, you get a lot of incomplete combustion in soot. Yes. And the failure to test the fuel and the poor fuel was a contributing factor, but the main efficient cause was the failure to take one boiler offline. When I get at that, the main efficient cause, when I look at this record, it's clear that the Navy requires that both boilers be kept running so that they can skedaddle out of port fast. That's not true, Your Honor. That's not true. What the record shows is that under the contract documents and the MSC SOM document, a document which was never disclosed during discovery and only used during this motion, those two documents were commercial documents. They told the commercial private operator, Crowley, we want our vessel back in the same condition we gave it to you, so make sure that you maintain the equipment in good order and condition, whether that equipment on the vessel is used or not. The Navy had command of the vessel, though, didn't it? The Navy had command of the vessel. And the Navy has a requirement that it be maintained at full readiness while on port, right? No. What the Navy says is that the vessel is capable of making flank speed at all times. My car in New York right now is capable of going full speed. I'm not using it, but it's capable, and that's what it is. It's purely a commercial document. Captain Darley stated at ER 87, the Cape inscription could not make full power with one of her steam boilers shut down. She didn't need to make full power. She had to be capable of making full power. She couldn't make full power in that port as it was. In a car, you can go from zero to 60. You turn the key, it takes maybe two seconds for the engine to get going, and then you can go from zero to 60 in somewhere between four and 12 seconds, depending on what you're driving. With a ship, according to the evidence in this record, it would take four hours to get the other boiler up to operating level, where they could then put pedal to the metal. Your Honor, first off, when they got to port, they turned off the engine. Second, this was the port of Antwerp. They had to go through locks. There was no reason to go full flank speed. But that's not what the issue here. The issue is, is whether the person who had discretion to turn off the boiler, it was the chief engineer, the chief engineer said, it's my discretion whether I turn off that boiler or not. He didn't have to report to the admiral. He didn't have to report to Marad. He didn't have to report to the master. That's his testimony. And under Ninth Circuit law, Fifth Circuit law, and the District of North Carolina, the chief engineer is not an employee of the Federal Government and therefore not covered by the discretionary function exception. He didn't need it. He's not getting sued. But you can only sue the U.S. Government in this instance. I don't have to sue the chief engineer. It's like the Cambazzi case out of this Court. We sue the Postal Service for the acts of their contractor. What the district court here did was to take the discretionary function exception and expand it to where it's never been expanded before, and that's to a private employee working for a contractor. So the contract says that the Crowley is supposed to ensure that the equipment, machinery, and appurtenances of the ship is maintained in the highest state of readiness and operation. And so the question is whether they would be in violation, Crowley would be in violation of their contract if they turned off one of the boilers because they wouldn't be maintaining it in the highest state of readiness and operation. And you're saying. State of readiness. Absolutely not. They turned off the engine. They secure the turbines, the generators when you come into port. That's part of ship operation. So you're saying the determination as to how to maintain that readiness is delegated to Crowley and to the employees of Crowley. Is that your position? My position is if Crowley or the captain had a policy that you were not entitled, they told the chief engineer, never turn off that boiler, I would be in a difficult position here. But what the chief engineer said was, I turned off a boiler when I see fit. It's my discretion. And that chief engineer testified, I don't tell Crowley, I don't tell the master, and I don't tell Marrard. It's my discretion. And he is not a government employee that's covered by the discretionary function exception. In the Camosi case, which dealt with the United Postal Service giving up its oversight of safety during a refit of a building, the contractor there, the Ninth Circuit, when they remanded the case down, told the district court, you have to make a determination of whether the contractor itself is a government employee. Here, the person who testified, I have discretion, was not a government employee. He was a private individual, a union worker, working on a government ship. All three cases. Does it matter that he was probably wrong about thinking he had discretion? I mean, as far as I could tell from the rest of the evidence, he didn't. Your Honor, Your Honor, then I would direct you to my reply brief, where I cite very extensively the captain's testimony, where the captain says that when he came on board the ship, he would begin his daily routine, check with the crew, talk with the crew, but when he got to the engine room, it was hands off. The chief engineer, he relied solely on the chief engineer for that. It wasn't until the motion was made and this new document, which was never disclosed during discovery, that we had the drafting of two declarations, which were extremely detailed. During the deposition of the captain and the married individual, they never once mentioned this document, never once mentioned the policy about the boilers, and they, in fact, testified that it was the chief engineer's discretion. And he is not an employee of the government. And the three cases that deal with contractors' employees, all. But the regulation says – see, I'm thinking it may not even matter that he's not – whether he's not an employee, assuming his agency, doesn't matter, because it says on the part of a Federal agency or an employee of the government. Yeah, what's Federal? The agency. There was no Federal agency here. The Navy is not a Federal agency? The Navy did not have a specific policy. Counsel, it looks to me like the Navy is the agency, and the Navy has a requirement that the ship be maintained in full readiness, and full readiness means ready to hustle out of the port at full speed in case there's a terrorist threat or some immediate need to leave some ship somewhere or something like that. They turned off the engine, Your Honor. They came into port, they turned off the engine. Boilers going. But they turned off the engine. So what your analysis is saying is that they can pick and choose what they mean by state of readiness. I understand it. It's like maybe I misunderstand the way these ships work, but I thought it was kind of like a car ride when you keep the boilers going. That's like keeping the motor on. But you turn off the engine, which means the boilers, you're not turning the propellers, kind of like when you are in neutral in your car so your engine is not turning your axis. Being a former mariner and working on these ships, Your Honor, I can tell you that turning off an engine takes time to secure the engine and putting it back on. And they turned off the engine and had no problem with that. They had crew go to shore to see a dentist. These are all things that where a vessel is not in the high state of readiness. The decision to turn off the boiler was made by an employee, a private employee. If you have to hustle out of port and some sailor says to the dentist, can't you just hustle out of there and leave him stranded? Not if he's the captain. It was the one who went to the dentist. You're talking about a cargo ship. This is not a warship, not a military. This was a cargo ship that had derelict pieces of equipment that they were dropping off. And the agency, the Navy, had no special requirement that the boilers be kept on. All it had to be... Once again, what does it mean to turn off the engine? Well, you have various parts of a ship. You have generators, an engine, and you have the boiler. The boiler provides for the power mechanism to run the engine. So you can turn off the engine and secure it away from the boiler and lock it so it doesn't move the wheel. It's a steam engine? Pardon? It's a steam engine? It's a steam engine. The steam from the boiler turns the wheel? Yes, Your Honor. So turning off the engine, does that mean disconnecting the wheel from the steam? You basically secure it. You, for lack of a better example, you just take out a locking pin so it can't move. Thank you, counsel. Good morning, Your Honor. May it please the Court, my name is Mike Underhill, and I represent the Department of Justice in the U.S. in this matter, the Admiralty Division. Your Honor, my background is a deck guy rather than engine guy, so I'll do my best to try to walk us through some of the factual issues the Court has raised.  It's a red herring, pure and simple. A geography lesson that I myself had to learn in this case. The first loading of relevant fuel in this case was in Pusan, South Korea. She loaded that fuel. There's no dispute that that fuel was not pretested. She ran on that fuel. Let's just call it the South Korean loaded fuel, to keep it simple. She ran on that fuel for 7,000 miles to Fujairah, United Arab Emirates in the Middle East. When she got to Fujairah in the UAE, she was out of that fuel. Now, there was that handwritten, I guess, captain's log or engineer's log that was introduced into evidence which indicated that there was Pusan. Well, actually, the answer to that is no, Your Honor. First of all, and I'm not trying to hide the ball on this one, there is no evidence in the record as to who wrote that. And our footnote that it was unattested, even the declaration of my colleague, Mr. Bennett, didn't cite a source for it. It says attached here, too, is a handwritten note with no source, no testimony, no anything. It's out of the record. My personal belief is that it wasn't, and I can see that from the context, but it's not a matter of record, so I can't speculate. So in terms of this Fujairah fuel, the uncontradicted evidence in the record cited by Judge Gelders, I think it's pages 38 to 41, roughly, is it was used up, used up, pure and simple, by the time she got to the UAE. When she loaded however many 10,000 barrels of fuel in the United Arab Emirates, she used that fuel to sail to Antwerp. That was the fuel being used at the time, and there is no dispute in the record that that was supplied to my opposing counsel's expert. He designed the test protocol. He said the lab that would test it, he, in his own testimony, said there was absolutely nothing wrong with that fuel. And in fact, as Your Honor pointed out, it's the same type of fuel that's used by 16,000 ships that call a year in Antwerp and about 98% of the world's shipping fleet. So that's the red herring. To bring it to the next step, which Judge Kleinfeld, I think, was trying to focus on, is the actions of the ship when they were actually in Antwerp. The only alleged fault that the plaintiffs alleged, the single alleged fault, was that they kept both boilers running. Now I stray into my non-deck aspect, into the engineering aspects on this one, to try to, if you picture it, it's a giant steam boiler, actually two separate steam boilers. It provides, your internal combustion engine uses gas, which is burnt, which fires, moves piston cylinders, and eventually turns the axle and the wheel. On this ship, a steam vessel, a giant, I mean, practically as big as this room, steam boilers that provide high-pressure steam. In order, if you shut that down and allow it to go cold iron, it takes roughly four to four and a half hours to bring it back up, both practically just to get the steam pressure and also to do it safely. That steam, let's assume it's fully functioning and it's up, as it was, that steam is then run through a whole series of complicated pipes and valves to a high-pressure steam turbine that actually converts it to power, to turns the shaft, then turns the screw or the propeller. What they did when they got into port was they disconnected the valves, they shut the valves, to make it simple, they shut the valves from the boilers that would go to the high-pressure turbines, so that this is a ship with 36,000 horsepower. When she's sitting at the dock, they want to do that, they need to do that, so if somebody accidentally opens a valve, you don't have a ship tied to a dock taken off under 36,000 horsepower. You've ripped your dock, you probably killed some people, you probably damaged your ship, a Navy ship in this case. All they do is they disconnect it. It's a 20-minute process that's in the record to basically turn the valves, it's approximately a 20-minute process. The analogy would be like if you were to do it the way that the plaintiffs would argue, you would keep your engine going, you would keep it in gear while you're parked at the curb, but you'd keep your foot on the brake. But if you take your foot off the brake, you're moving, you're hitting pedestrians. What they did here, essentially, the engine is kept in, I should say the boilers, the power is kept functioning. They put it in park. When they shut off the valve that lets the steam turn the turbine, what happens to the steam? It's allowed to escape. I mean, they've got pressure relief valves. I mean, it doesn't just sit and blow up like a tea kettle that you shut. Does it blow up in the air through the stack or is there some other relief? You know, I'm probably out of my scope on this one, Your Honor, but if you're asking does the steam escape, yes, it does, but it's pure steam. I mean, it's steam, it's water, water vapor. Does the contract requirement that the Navy had with Crowley that says you have to maintain the equipment in the highest state of readiness and operation, does that require the Crowley to keep both boilers running? Is that the necessary step so there wouldn't be discretion on Crowley's part? It doesn't specifically say that thou shalt keep this piece of equipment running but not that piece of equipment. It doesn't say that. It says all equipment in its highest state of readiness. And you have to put yourself in the position of the master of the vessel. What the plaintiffs attempted to do in subsequent briefing after the motion was actually filed was to hindsight it. In other words, well, okay, she eventually got out of Dodge okay, so he could have done all these things. The master, when he gets into Dodge, when he parks his ship next to that dock, that's when he has to make the decision do I shut down the boilers, do I keep them running? If I shut them down, I'm violating express written Navy policy. Now, is that correct so that every ship contractor who has a contract with the Navy who has this type of readiness requirement would have to keep both boilers running whenever they're in a port? Is that correct? That would be correct as long as they're in this activated phase zero, phase O status. These ships, they spend much of their life tied to a dock in a U.S. port, ready to be called up in times of national emergency or whenever the Navy decides. Was there evidence that full state of readiness means both boilers? Yes. Uncontradicted by both the master and the chief engineer and also the MARAD ship, the man that manages the fleet. Why don't you have a genuine issue of fact that the engineer said it's up to me whether to keep one or both boilers running? Very simply, Your Honor. First of all, my colleague, and I don't think he was misleading, trying to mislead the Court, the testimony is actually cited in the record. The paraphrasing of the testimony is not the testimony. It's not. Counsel tries to put words in the witness's mouth, and the witness was asked very general, imprecise questions. If they actually even read the testimony, it doesn't even ask him whether he's talking about when the vessel in this activated phase O status. If they were in ROS, reserve status, and port, which in many cases they do keep their engines running. He does. I'm sure that there's, at that point, they're not under Navy control. This is a case where the vessel specifically is under active duty United States Navy control, and as the record reflects, it's a tactical part of the United States Navy, a tactical part. Could you give me a citation to the testimony of which you're making reference? If I can't, I can get it for you in a second, Your Honor. If you have a yellow sticky and highlighting on it, just read it. Actually, I think it's the supplemental excerpts of record at page 23 of the supplemental excerpts, and I hope I've got that wrong. Right. Actually, my notes, looking at my notes, the question is actually phrased in the context of what counsel was asking him about a bottom blowing the boiler. And I'm really out of my engineering league here. Bottom blowing the boiler isn't even an issue in this case. Blowing the tubes has nothing to do with bottom blowing the boiler. And if you were going to ask me a technical reason why that's the case, I'm afraid I'm out of my league. I assume you've mastered this case to present it. Let's see. The question and answer at issue is line 11 on page 23 of the supplemental excerpts. If you wanted to take the boiler offline to bottom blow, I remember what bottom blow is. That's when you blow your soot out into the water instead of up through the stack. Actually, no. Bottom blowing the boiler refers, if I'm not mistaken, Your Honor, to actually flushing. I believe it refers to flushing water and steam out. Actually, it's a process that blows it out. In fact, I do know this. It's a process of blowing steam through pipes that actually exit under the water level. This has nothing to do with the stack. That's what I just said. I'm sorry. So you're a better engineer than I am, Your Honor. I'm not an engineer at all. I just thought I'd read that somewhere here. Yes. So that is true? Yes. It refers to blowing steam underwater rather than through the stack. If you wanted to take a boiler offline to bottom blow, could you or would you need to tell Crowley or Nowrat you were going to do that? That would be at my discretion. Was there other testimony about whether he could leave the boiler, let it go cold? From whom, Your Honor? Anybody. Both. Both the chief engineer and the master in their declarations filed, I believe, masters in support of the motion. It's in the excerpts of record. The chief engineer in the reply, and I think the master filed also a supplemental, and also the Nowrat supervisor also filed a declaration. What did they say? Does the engineer think he has discretion to let a boiler get cold? The master has that discretion. The master is the person, the overall charge of responsibility. He's the man who has to report to Nowrat. Did the master say that he had discretion to let a boiler get cold? Well, he would have the discretion to do that, but he also testified that he would never do that because it would be violating Navy policy. So he's saying he does not have the discretion under Navy policy or he does have discretion? It's a hard one. I'm not trying to evade it. Okay. Where did he say it? Here's what he said. I would not have permitted either of the ship's two boilers, this is Darley, to be shut down intentionally except in the event of an emergency. That is, an emergency that would have threatened the ship, her cargo, her crew, and or mission unless the boiler was shut down. Correct, Your Honor. That's in his declaration at ER 87. I guess what I'm trying to say, Your Honor, there's nothing that says keep your boilers up. It says all your equipment. The master in trying to interpret that, as I take it, would say, look, I suppose I could, but I would never do that. Now, when the question, you were talking about imprecision of the questioning, the question is, was it a requirement that the Cape inscription always maintain both boilers online? Answer, no. And you're saying that the always maintain both boilers online would mean even when you're outside of phase O state of readiness. Is that why you're saying that? If they were outside of phase O, if they were in reserve status. So if they were not in phase O activation, then it would not be a requirement to maintain both boilers online. Is that correct? That's correct for the simple reason that they're not under Navy control at that point. They are only under Navy control when they're activated from ROS reserve status to phase O active status, which they had been for about 25,000 miles. So you're saying that the engineer's testimony doesn't create a genuine issue of material fact because the vagueness of the question doesn't tee it up as being in contradiction to what the master said.  Precisely, Your Honor. But I also lost in our dialogue that the Court asked, or I don't know who brought the issue up, about summary judgment. This is not a Rule 56 summary judgment motion. This is a Rule 12b-1 motion, and Judge Delder cited the cases. In fact, my colleague in their opposition brief in the court below agreed. They stated that this is a case governed by Rule 12b-1. In Rule 12b-1, unlike a summary judgment motion under Rule 56, if the parties put matters outside the pleadings at record, and both of us did, then the court need not convert it to a summary judgment motion if there's a disputed issue of fact. And in fact, the court is allowed to resolve factual disputes under a 12b-1 motion. And counsel agreed that that was the standard that applied to this case. Well, they're citing now a safe air for everyone in those cases, saying that the jurisdictional and merits issues are intertwined. Well, in this one, I don't think the jurisdictional issue is actually intertwined. And, I mean, I think that's a very different one. I think in this one, the jurisdictional issue is actually very simple, that the contradicted record is that the contract that contains, and I should stress that our appellate brief only contains references to the contract that was provided to opposing counsel at the inception of the case. Those provisions govern this case. There is no dispute that those provisions govern the actions of Crowley, its master, its chief engineer, when they're operating in activated FASO status and under the direct control of the United States Navy. No dispute whatsoever, Your Honor. I don't see a factual dispute there. And in terms of if there's an ambiguity in Chief Engineer's testimony, he shouldn't be forced to apologize for an imprecise question that did not ask him or actually did ask him the context in a bottom blow, which is irrelevant, and secondly, didn't even specify that the vessel in the question, whether it was under FASO or ROS status. Did the magistrate judge actually make any finding of fact? Negative, Your Honor. It was in the sense of an opinion. The power to make findings doesn't really, on 12b-1, doesn't really matter if he didn't make findings. That's correct. I mean, it's, well, he made, whatever findings he made are encompassed in his order and opinion. There's no requirement to make findings of fact. I'm looking at it. It looks like legal judgments rather than findings of fact. But I easily could have missed something. Well, I think that if the question is what is the standard of review on discretionary function, it's clear. It's de novo. If the question is he made, for example, the magistrate judge made a finding that the Korean fuel was irrelevant based upon the uncontradicted record. If that's a factual finding, so be it. And that's reviewed under an abuse of discretion standard. My time is up. Thank you very much. I can't remember if the colleague had time left. Madam Clerk, did he? Looks like no. Thank you, counsel. Tokyo Marine. If my colleague has questions, we'll have additional time anyway. Thank you, counsel. Tokyo Marine versus the United States. Thank you.
judges: Kleinfeld, Bea, Ikuta